# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

Darren E. Green,

    Plaintiff,

    v.

Madison Metropolitan School District, John Hagan,
And Eric Kestin,

    Defendants.

Case No. 18-cv-38

# COMPLAINT

## I. NATURE OF ACTION

101. This is a civil action brought by the Plaintiff in order to obtain redress for the violation of rights secured to him by Title VII of the Civil Rights Act of 1964, as amended, Title 42 of the United States Code, § 2000e, *et seq.*, as well as by the Civil Rights Act of 1866, codified at Title 42 of the United States Code, § 1981, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both of which are enforceable by a civil action under the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, which occurred when he was harassed, and discriminated against on the job because of his race and color, black.

## II.     JURISDICTION AND VENUE

### A.     Jurisdiction

201. Jurisdiction over the Plaintiff' claims under Title VII of the Civil Rights Act of 1964 is conferred on this Court by 42 U.S.C. § 2000e-5(f)(3). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B.     Venue

202. The Western District of Wisconsin is the proper venue for this action because the plaintiff's claims arose within the geographical boundaries of the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b), and because it is a judicial district in the state in which the unlawful employment practice is alleged to have been committed within the meaning of 42 U.S.C. § 2000e-5(f)(3).

## III.     PARTIES

### A.     Plaintiff

301. The Plaintiff Darren E. Green is a citizen of the United States with the capacity to sue and be sued in this Court. He is of the black race and color.

### B.     Defendants

302. The Defendant Madison Metropolitan School District is a legal

entity, with the capacity to sue and be sued in this Court. It is an employer within the meaning of Title VII and is subject to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

303. Defendant John Hagan was at times material hereto, the MMSD's West Side area custodial supervisor and one of Mr. Green's superiors.

304. Defendant Eric Kestin was at times material hereto, the MMSD's Affirmative Action Officer/Title IX Investigator/Contract Compliance Monitor.

IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. The Plaintiff is employed as a custodian at the rank of Worker I for the Madison Metropolitan School District (MMSD).

402. His wife is an administrator with the school district and he moved to Madison with her in the summer of 2014 when she was offered a job here.

403. Mr. Green had been a supervisor of custodians previously, and he applied for and was hired into a custodian position with the MMSD.

404. Mr. Green started out at Stephens Elementary School in August of 2014, and worked there for a little over a month. He was then sent to work at Hamilton Middle School and Van Hise Elementary School. He worked in that position, on a 2:00 p.m. to 10:00 p.m. shift, for about eight weeks and then was moved to West High School for about four months. He was then transferred again and divided his time between Olson Elementary School and Chavez Elementary School. He was being paid $20.00 per hour.

405. At Stephens, his immediate supervisor was Russ Dokken, the Head Custodian. Dokken reported to John Hagan, the Westside area supervisor.

406. At one point Hagan telephoned Dokken and told him that Mr. Green should report to Van Hise in the afternoon.

### A.   At Van Hise Elementary School.

407. After he began working in Van Hise, Gary Ferry, the Head Custodian there, started accusing Mr. Green of not putting paper towels into the classrooms.

408. In fact, Mr. Green and his lead worker, Stan Ridderbusch, has put the paper towels into the classroom dispensers together.

409. Apparently, Ferry went to Hagan and told him that he, himself, had been required to go around and put the paper towels in the classrooms.

410. Hagan approached Mr. Green in a hallway and asked him about this. Mr. Green said, truthfully, that he had in fact installed the towels.

411. Stan Ridderbusch was a Worker III and was in charge of the custodians working at night at Van Hise Elementary School.

412. Hagan told Ridderbusch to review Mr. Green twice a week, although Ridderbusch was reviewing other employees under him only once a month.

413. Ridderbusch knew that this would provide Hagan with ammunition to use against Mr. Green, because supervisory workers in his position were

expected to find at least one thing wrong with a custodian's performance on each review.

414. Mr. Green learned of Hagan's instruction to Ridderbusch because Ridderbusch told him about it.

415. After that, Mr. Green noticed that Hagan began to creep up on him from time to time.

416. On November 12, 2014, at about 6:00 p.m., Hagan told Mr. Green to get on his hands and knees and scrub the base boards.

417. Green argued with him about this, and Hagan said that Green needed to learn how to shut his mouth.

418. A female teacher, Donna McGuire, falsely accused Mr. Green of making inappropriate advances toward her.

419. She reported this to the Van Hise principle, Peg, to Bob Darm, the manager of buildings and grounds, and thereby of all custodians, and to a lady named Heidi Tepp in Human Resources.

420. Mr. Green was told to stay away from the teachers. He was told not to talk to them and not to socialize with them.

421. Mr. Green took this advice to heart, but nonetheless the same teacher complained when Mr. Green simply cleaned her room on one occasion and this led to Mr. Green's transfer to West High School.

422. Hagan told Mr. Green that he was being transferred to West to round out his experience as a custodian for the MMSD, but this was a lie; Mr. Green

5

was transferred because the decision was made by Robert Darm (Assistant Director of Facilities and Hagen's supervisor) and Heidi Tepp (Labor Relations Director) to transfer Complainant to West High School.

**B.     At West High School.**

423.    When Mr. Green got to West, his new supervisor, Ken Goldsby, spoke with him and said words to the effect of, "All I want you to do is come here, do your job and we won't have any problems."

424.    This was his ordinary introduction to new custodians.

425.    On his first day of work at West, Goldsby spoke to Mr. Green and said he had noticed that Mr. Green was very thorough.

426.    Mr. Green said that he had previously been head custodian in the Naperville, Illinois, school district.

427.    Hagan spoke to Mr. Goldsby about Mr. Green and directed Goldsby to review Mr. Green's work twice a week.

428.    This was unprecedented.

429.    In contrast, Mr. Hagan took two white custodians in training, who needed review and correction, away from Mr. Goldsby's supervision and reassigned them where they would not be reviewed at all.

430.    That night, Goldsby showed Mr. Green around the building and then took him into an office and asked what was going on between Mr. Green and Mr. Hagan.

431. Mr. Goldsby said, "He told me to write things up on you and he will take care of the rest."

432. Mr. Goldsby said, "When they tell me things like that, it means they are trying to get rid of you."

433. Mr. Green simply said, "Thanks for telling me."

434. The next day Mr. Goldsby and Mr. Green spoke again and Mr. Green started crying. Mr. Goldsby grabbed both of Mr. Green's hands and said, "We are going to pray about this." Mr. Goldsby said, "I'm going to find out what's going on with John [Hagan]."

435. Goldsby then did speak with Mr. Hagan and later spoke to Mr. Green about their conversation.

436. According to Goldsby:

   a. Goldsby said to Hagan, "What is your problem with this guy?"

   b. Hagan replied, "He thinks he's a know-it-all."

   c. Goldsby then responded, "Well, he's got experience and that's something we should embrace."

437. Goldsby told Mr. Green about this conversation shortly after it had occurred.

438. He said that Hagan had instructed him to do an inspection on Mr. Green's work twice a week.

439. This was much more frequently than Goldsby inspected the other janitors and Hagan knew this.

7

440. On September 30, 2014, at about 6:45 p.m., Hagan said to Mr. Green, "You black son of a bitch."

441. He may have said this more than once.

442. Mr. Green reported at least one of these remarks to Mr. Goldsby.

443. Goldsby could tell that Mr. Hagan did not like Mr. Green because Hagan arranged to have much more contact with Mr. Green than with white custodians, and took it upon himself to scrutinize Mr. Green's work, though this was Mr. Goldsby's job in the case of other, white, custodians working under him.

444. Hagan also came around at inappropriate times and appeared to Mr. Goldsby to be sneaky and secretive in checking up on Mr. Green.

445. At one point Hagan snuck into the West high school building and went into a classroom. Mr. Green saw this and reported it to Goldsby, who said, "Watch yourself."

446. Goldsby tried to protect Mr. Green somewhat by working in closer proximity to him, so that he could observe if Hagan came around to sabotage his work.

447. A friendly teacher named Susan Ihler, who lived near West High and frequently drove past the school in her off hours, noticed that some of the shades were pulled down in the study hall room in the evening hours when she drove past.

448. She thought this was odd because theses shades had never been pulled down previously.

449. One night, on her way to the grocery store, she noticed a district custodial truck parked outside the school, with its engine running and its headlights beaming into the study hall room.

450. She saw a white male behind the wheel of the truck, and Mr. Green in the study hall, cleaning, with one or two of the shades down.

451. One her way back from the store, she noticed that the truck had been moved down to the next room and was shining its lights through its windows while Mr. Green was inside cleaning with one or two of the shades down.

452. Ms. Ihler noticed the same thing on several other nights.

453. The man shining the headlights into the rooms Mr. Green was cleaning was Mr. Hagan.

454. Ms. Ihler then spoke to Mr. Green about what she had been seeing.

455. She advised him to just draw all the shades in the rooms he was cleaning so he would not have to put up with the harassment she had observed.

456. After this, Mr. Green was reassigned to Olson and Chavez.

**C.    Mr. Green's Complaint.**

457. Mr. Green initially raised his concerns about Mr. Hagan orally in a meeting scheduled to discuss possibilities for his advancement, involving at least Michael G. Barry and Deirdre L. Hargrove-Krieghoff, on January 6, 2015.

458. On January 26, 2015, Mr. Green complained to Bob Darm about racial harassment by Mr. Hagan.

9

459. On January 27, Heidi Tepp sent Mr. Green a link to a complaint form by e-mail.

460. Mr. Green's complaint resulted in a meeting at Olson elementary school between Bob Darm, Mr. Green and John Hagan, on February 2, 2015. At the meeting, Hagan admitted the things that Mr. Green said he had been doing, including telling Ridderbusch and Goldsby to write things up on Mr. Green.

461. Also on February 2, 2015, Mr. Green was seen by mental health care providers at Dean Clinic for symptoms of depression caused by the treatment he was receiving at work.

462. Being subjected to these discriminatory actions, and to uniquely intense levels of scrutiny, criticism and hostility, was very trying for Mr. Green.

463. He is ordinarily a cheerful and optimistic fellow and his personality and friendliness tend to brighten the days of those he encounters on and off the job.

464. He lost his optimistic outlook and his inveterate cheerfulness. His aspect became one of constant vigilance and worry.

465. When he sought professional help from treatment providers at the Dean Clinic on February 2, 2015, he was placed on a course of prescription antidepressants and referred for a psychiatric evaluation and further treatment.

466. Mr. Green found the side effects of the antidepressants unbearable.

467. While doing volunteer youth coaching, he found it difficult or impossible to even speak sometimes, so he terminated the antidepressants.

468. When his symptoms were at their worst, his marriage was affected.

469. Mr. Green filed an internal complaint on February 6, 2015.

470. On February 13, 2015, Mr. Green was diagnosed as follows:

situational anxiety and depressed mood which seem to have been triggered by work related stress. . . . Was being harassed by his supervisor and was not felt to be taken seriously by management until recently. Feels he has not received his due retribution and that the supervisor's 4 day suspension was not enough. Described racial undertones to harassment. Anxiety heightened as a result of this and mood has been low. Major complaint at this time is difficulty with sleep due to anxiety. . . .

471. The investigation of Mr. Green's complaint was assigned to school Eric Kestin, the District's Affirmative Action Officer/Title IX Investigator/Contract Compliance Monitor. Kestin interviewed Mr. Green about his grievances and interviewed other persons as well.

472. Kestin wrote a report on May 18, 2015, summarizing his findings and conclusions.

473. Kestin found no racially motivated misconduct on the part of Mr. Hagan.

474. As to Mr. Green's report that Hagan had either subjected his work to exacting inspections or directed others to do so more frequently than other similarly situated workers were inspected, Mr. Kestin wrote:

Mr. Green, Mr. Bahr, Mr. Van Erem and Mr. Collins were the four custodians most recently hired for the West side schools and all were supervised directly or indirectly by Mr. Hagen. Based on inspection reports received from Mr. Darm, Mr. Green was inspected 22 times during his probation. While 4 of those inspections were completed by Mr. Hagen, most of them were completed by Mr. Goldsby. Mr. Bahr had 14 inspections completed during his probation with 4 of them done by Mr. Hagen. Mr. Van Erem received 15 inspections with 3 of them completed

11

by Mr. Hagen. Mr. Collins received 8 inspections with 2 of them completed by Mr. Hagen.

475. Accordingly, the average number of inspections of the other three workers was 12.3, nearly ten less than Mr. Green experienced. The number of inspections Mr. Green experienced was 179% of the average number of inspections experienced by the other workers.

476. As to Mr. Green's report that Hagan had called him a "black son of a bitch," Kestin wrote, in part:

> However, even if Mr. Hagen used this phrase with Mr. Green it would not be enough, by itself, to prove that Mr. Hagen's actions were influenced by Mr. Green's race; though it would be considered an inappropriate way for District employees to communicate with each other, especially where a supervisor-employee relationship exists.

477. As to Mr. Hagan's complaint that his lead worker, Ken Goldsby, had been told to be extra hard on him, Kestin wrote in part:

> Before Mr. Green arrived at West which was not his initial placement, Mr. Hagen told Mr. Goldsby that Mr. Green was "connected" and that he wanted detailed inspections of Mr. Green. Mr. Goldsby added that Mr. Hagen usually just said inspections without adding the word "detailed".

478. This differential treatment was not motivated by any belief that Green was a poor performer. Kestin wrote that, "Mr. Goldsby stated that Mr. Green was 'the best trainee hands down he ever trained'."

479. Kestin's concluding finding was this: "Substantial evidence does not exist to support a conclusion that Mr. Green was discriminated against by Mr. Hagen because of his race since being employed in August 2014."

480. On June 1, 2015, Jennifer Cheatham, the Superintendent of Schools, sent Mr. Green a letter stating that the district's investigation had been concluded, that no racial harassment or discrimination had been found, and that, although some action might be taken to improve supervisory training, no action would be taken to terminate the harassment of Mr. Green or to correct any harassing or discriminatory conduct or practices on the part of district personnel.

481. The fact that the Defendant District had permitted Hagan's discriminatory treatment and then declined to find discrimination even when presented with the evidence left Mr. Green feeling extremely vulnerable to discriminatory treatment in the future, and, although Hagan did not target him as frequently as had been the case in the past, his psychological symptom continued.

## V. BASES OF LIABILITY

### A. Title VII.

501. The Defendant District violated Mr. Green's right to be free from discrimination in the terms and conditions of employment on the basis of race and color secured to him by Title VII of the Civil Rights Act of 1964.

### B. The Equal Protection Clause of the Fourteenth Amendment.

#### 1. Individual Defendants.

502. Defendant Hagan violated rights secured to Mr. Green by the

Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States to be free from discrimination in employment on the basis of race and color when Defendant Hagan harassed Mr. Green, and caused him to be harassed, on a frequent basis.

503. Defendant Kestin violated rights secured to Mr. Green by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States to be free from to be free from discrimination in employment on the basis of race and color when he failed to perform and adequate investigation of Mr. Green's complaint, failed to draw appropriate conclusions from the evidence, and ultimately issued a report that found no discrimination on the part of Mr. Hagan and caused the district to take no action to protect Mr. Green from further harassment at the hands of Mr. Hagan.

### C. 42 U.S. C. § 1981.

504. Defendant Hagan violated rights secured to Mr. Green by 42 U.S.C. § 1981 to be free from discrimination in the terms and conditions of his employment on the basis of race when Defendant Hagan harassed Mr. Green, and caused him to be harassed, on a frequent basis, and these violations are redressable through this action pursuant to 42 U.S.C. § 1983.

505. Defendant Kestin violated rights secured to Mr. Green by 42 U.S.C. § 1981 to be free from discrimination in the terms and conditions of his employment on the basis of race when he failed to perform an adequate

14

investigation of Mr. Green's complaint, failed to draw appropriate conclusions from the evidence, and ultimately issued a report that found no discrimination on the part of Mr. Hagan and caused the district to take no action to protect Mr. Green from further harassment at the hands of Mr. Hagan, and these violations are redressable through this action pursuant to 42 U.S.C. § 1983.

## VI.  DAMAGES AND EQUITY

### A.  Compensatory Damages.

601.  Mr. Green has sustained lost income, mental and emotional distress, treatment expenses, damage to his reputation and lost future earning capacity as a result of the Defendants' unlawful conduct, for which he seeks an award of compensatory damages.

### B.  Punitive Damages.

602.  Because the acts of the individual Defendants herein alleged were carried out maliciously or with reckless disregard for Mr. Green's fundamental rights, the Plaintiff seeks an award of punitive damages against the individual Defendants to deter them and others similarly situated from similar wrongful acts in the future.

### C.  Equity.

603.  For some of his injuries the Plaintiff may have no plain, adequate, or speedy remedy at law and he thus invokes this Court's equitable jurisdiction to

award such injunctive and declaratory relief as may be necessary and appropriate to make him whole.

### VII. CONDITIONS PRECEDENT

701. All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred, or have been waived by the Defendants.

### VIII. REQUEST FOR JURY TRIAL

801. The Plaintiff requests a trial by jury of all claims triable of right to a jury.

### IX. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the court to grant a judgment against the Defendants awarding the full amount of his damages together with interest, costs and attorney's fees and such other and further relief as the Court deems just.

Dated this Thursday, January 18, 2018.

        Respectfully submitted,

        Darren E. Green,

        Plaintiff,

        By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI 53703
Phone       608/283-6001
Fax         608/283-0945
Email:       jsolson@scofflaw.com

/s/ Jeff Scott Olson
_____

Jeff Scott Olson
ATTORNEY FOR PLAINTIFF

### Certificate of Service

I hereby certify that on Thursday, January 18, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: none, and I hereby certify that I have mailed by United States Postal Service the document to the following non ECF participants: all Defendants.

/s/ Jeff Scott Olson_____

17